UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| DAVID KNOX, and | : | |
| CAROLINE SCHACHT | : | 18-CV- |
| | : | |
| Plaintiffs, on behalf | : | |
| of themselves and all others similarly situated | : | CLASS ACTION COMPLAINT |
| | : | |
| - against - | : | <u>JURY TRIAL DEMANDED</u> |
| | : | |
| CENGAGE LEARNING HOLDINGS II, INC., | : | |
| CENGAGE LEARNING, INC., and DOE | : | |
| AFFILIATED ENTITIES 1-10 | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs David Knox and Caroline Schacht, on their own behalf and on behalf of similarly-situated class members (the "Class Members") with respect to the class allegations, by and through their attorneys, Slarskey LLC, allege as follows for their complaint against Cengage Learning Holding II, Inc., Cengage Learning, Inc., and their parent, subsidiary, divisions, affiliates, and successors in interest Doe Affiliated Entities 1-10 (collectively "Cengage"). Allegations are pleaded on information and belief except for with respect to Plaintiff-specific allegations, which are pleaded based on the knowledge of Plaintiffs:

## <u>NATURE OF CASE</u>

1.     Plaintiffs are authors of textbooks published by Cengage, who have contracted with Cengage (or a predecessor-in-interest, or affiliate of Cengage) for Cengage to publish, sell, and distribute their textbooks, pursuant to publishing agreements that provide for the payment of royalties on the sale of their works. The fundamental bargain struck between Plaintiffs and their publishers was for the payment of royalties upon the *sale* of their works.

2.     In 2014, however, Cengage came out of bankruptcy with a plan to overhaul its business model. In doing so, Cengage has trampled on its authors' rights. The class

allegations in this lawsuit (the "Class Claims") arise out of three related practices by Cengage that are disputed by Plaintiffs:

3.      *First*, Plaintiffs dispute Cengage's new "Cengage Unlimited" business model, pursuant to which Cengage is systematically dismantling and frustrating the business of selling Plaintiffs' works, in favor of selling subscriptions to Cengage's catalog of titles. In transforming its business model, Cengage is wrongfully implementing a unilateral change to the compensation structure for its authors, seeking to convert the contractual "royalty-on-sale" compensation model agreed to by Plaintiffs into a "relative use" compensation structure designed by Cengage, for Cengage's benefit, which Plaintiffs reject. Rather than compensate its authors for the sale of their work, as agreed in the publishing agreements, the Cengage Unlimited model offers each end user an "all-access" pass to the Cengage catalog, and then compensates authors based on the relative use of their works by the end-users. Under this system, which is inconsistent with the royalty-on-sale model, authors are not paid a royalty for each *sale* of their works, but rather a fractional percentage of Cengage's subscription fees, based on *the relative use* of the work. Cengage's dismantling of its "royalty-on-sale" business model frustrates Plaintiffs' ability to earn royalties on the sale of their works, and constitutes a breach of the implied covenant of good faith and fair dealing implicit to the Publishing Agreements. Plaintiffs expect their royalties to decline substantially as a result of the Cengage Unlimited business plan.

4.      *Second*, as Cengage's emphasis on digital distribution has expanded, so too has its distribution of digital "courseware," integrated digital offerings, derived from an author's work, that include such add-ons as multimedia displays, homework, quizzes, tests and other supplements. For purposes of calculating the royalties due to Plaintiffs on courseware, Cengage has adopted a portfolio-wide practice of arbitrarily and improperly ascribing value to the supplemental material packaged with the author's work, or to the digital packaging itself,

when the courseware is derivative of the author's work and the author royalty should be paid on the entire, or substantially all, of the courseware package. The effect of this practice is that Cengage reduces the base against which an author's royalty rate is applied for courseware sales, so as to improperly reduce royalty payments to authors. Cengage's widespread practice of arbitrarily apportioning value on derivative works has significantly eroded royalties paid to Plaintiffs, and constitutes a breach of the Publishing Agreements.

5.     *Third*, over the past year, Plaintiffs have experienced marked declines in their per-unit royalty payments, and have sought access to underlying sales data and royalty calculations, so that they can determine how their royalties are being calculated and whether they are getting the benefit of the bargain that they negotiated. Despite the fact that Cengage maintains the requested information and could readily supply it to Plaintiffs, and that such information is reasonably necessary for Plaintiffs to determine the accuracy of the royalty reporting that—on its face—appears to be erroneous, Cengage has adopted a policy of refusing to provide the requested data. Cengage's refusal to provide royalty and sale data constitutes a breach of the implied covenant of good faith and fair dealing implicit to the Publishing Agreements.

6.     In addition to the class claims described above, Plaintiffs assert individual breach of contract claims against Cengage for frustration of their royalty-on-sale publishing agreements, underpayment of royalties, and refusal to provide information reasonably necessary to determine the validity of Cengage's royalty payment calculations.

7.     With respect to the Class Claims, Plaintiffs seek relief from the Court as follows: (i) damages for Cengage's breach of the Publishing Agreements and frustration of the agreed upon royalty-on-sale compensation structure; (ii) injunctive relief prohibiting Cengage from including Class Members in the Cengage Unlimited subscription model without their

permission; (iii) for those Class Members whose work has been included in the Cengage

Unlimited subscription model without their permission, equitable termination of the Publishing

Agreements, with a reversion of all rights to Class Members for their works; and (iv) declaratory

relief that Cengage is obligated to provide information, in a reasonably requested form, so that

Class Members may determine the accuracy of sale and royalty reporting. Plaintiffs,

individually, seek damages for royalty underpayment and equitable termination of their

publishing agreements with Cengage, including a reversion of rights.

## JURISDICTION

8.    This Court has jurisdiction over all causes of action asserted herein

pursuant to 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or

value of $5,000,000.00, and there is diversity of citizenship between proposed class members

and Defendant.

9.    Venue is proper in this District under 28 U.S.C. § 1391(a)(1) and (2).

Defendants maintain an office at 75 Greene Street, New York, NY 10012, and conducts a

substantial amount of business in this District, including contracting with members of the Class,

and sale and distribution of Plaintiffs' works. In the past year, Defendants have sold millions of

dollars worth of textbooks, and other types of books, in this District.

## PARTIES

10.    David Knox resides in Winterville, North Carolina, and is party to

agreements dated October 9, 1981 and January 25, 1994, respectively, both with West

Publishing, Inc., for the publication of works entitled "Marriage and Family" and "Social

Problems" (the "Knox/Schacht Agreements"). Cengage is the successor to West Publishing for

these agreements.

11.     Caroline Schacht resides in Winterville, North Carolina, and is party to the Knox/Schacht Agreements.

12.     Cengage Learning Holdings II, Inc., ("Cengage Holdings"), together with its subsidiaries including Cengage Learning, Inc., operates as a publisher and distributor for higher education textbooks, print, and electronic learning aids. Cengage Learning Holdings II, Inc. has a residence in the State of New York at 75 Greene Street in New York, NY.

13.     Cengage Learning, Inc., ("Cengage Learning"), is a Delaware Corporation registered to do business in the State of New York with a residence at 75 Greene Street in New York, NY.

14.     Doe Affiliated Entities 1-10 are Cengage affiliates or subsidiaries that act as counterparties to various Publishing Agreements with Class Members for the benefit of Cengage.

## DETAILED ALLEGATIONS

### A.  The Typical Publishing Agreement

15.     Cengage is a publisher, seller, and distributor of textbooks and learning-materials, which emphasizes the provision of academic materials for use in institutions of higher learning.

16.     Historically, the Cengage business model has entailed obtaining publishing agreement contracts with academic authors (generally professors), pursuant to which (i) the author agrees to produce an academic textbook for the publisher, and transfers some or all of its copyright rights to the publisher; (ii) the publisher, in turn, agrees to publish, market, *sell*, and distribute the work; and (iii) the author earns a per-sale percentage royalty on the net revenue from his or her work (each such agreement a "Publishing Agreement").

17.     For many years, this has been the typical structure of Publishing Agreements in higher education—both between Cengage and its authors and other publishers and their authors. Over the years, Cengage has become the successor-in-interest to thousands of similar Publishing Agreements, as it has acquired or merged with other publishers.

18.     The fundamental bargain struck in the Publishing Agreements is that the publisher supports the publication, ***sale***, and distribution of the author's work, and pays a ***percentage royalty to the author based upon the net revenue obtained from each copy sold.*** . Based upon the agreed upon compensation terms in the Publishing Agreements, Plaintiffs relied upon, and expected, their publisher to support the sale of their works in a commercially reasonable fashion.

**B.  Cengage's Bankruptcy**

19.     Dating back more than a decade, the textbook publishing industry has been adapting to significant technology shocks. Several trends have apparently had an adverse effect on the profitability of publishing.

20.     First, the marketplace for used and rented materials has expanded significantly, particularly as the result of online marketplaces and the ease with which material can be located or distributed. Even new sales are impacted by the online marketplace, as students can comparison shop and seek bargains rather than buying locally or through college bookstores.

21.     Second, students have increasingly become reliant upon e-readers, tablets, and electronic books as an alternative to printed copies. Digital books present challenges to publishers, and tend to erode printed sales and revenues.

22.     Third, "open source" alternatives to traditional textbooks are gaining ground, *i.e.*, learning materials prepared by the academic community, which may be circulated digitally at zero marginal cost to students.

23.     Finally, students and instructors have increasingly turned to digital versions of author works, rather than traditional printed textbooks and supplements, which are typically offered at a lower price. Cengage's digital learning materials—including its "MindTap" digital supplements—are derived from the author works, and may include supplemental or interactive components, such as practice material, quizzes, or multimedia additions.

24.     In July 2013 Cengage Limited filed for bankruptcy protection, with $5.8 billion in debt and an inability to meet its ongoing obligations. The company emerged from bankruptcy in April 2014, relieved of $4 billion in debt, and securing an additional $1.75 billion in exit funding.

25.     At the time it emerged from bankruptcy, Cengage's CEO, Michael Hansen was interviewed by the noted publication, "Inside Higher Ed." In that interview, Hansen stated that there was a "growing awareness in all positions of [Cengage] that the model that used to make Cengage successful … is no longer in place." (*See* **Exhibit 1** "Cengage Surfaces," https://www.insidehighered.com/news/2014/04/02/cengage-learning-emerges-bankruptcy-focus-digital-growth, last visited April 24, 2018. at 2.)

26.     Hansen further stated that the reorganized Cengage "is much closer to a software company than a traditional publisher," noting that product development would thereafter be handled by "five different silos," led by "a general manager and a chief technology officer." (Ex. 1 at 2.)

27.     When Cengage emerged from bankruptcy, its operating plan projected that Cengage would double its share of active digital users to 4.8 million by the 2018 fiscal year, and that, by 2018, "40 percent of the company's adjusted earnings before interest, taxes, depreciation and amortization will come from digital offerings such as MindTap, a cloud-based learning platform that combines readings and multimedia with assessments and analytics." (*Id.* at 3)

28.     Cengage and its CEO, Hansen, embraced the need to overhaul the Cengage business model, stating that the "turn" for Cengage would come when "we at Cengage have developed compelling alternatives to the textbook experience." "The real inflection point in this market," Hansen stated, would come "when a student ***buys a digital solution*** that can become a ***digital substitute*** for the textbook." Hansen further stated that he "want[ed] to push very aggressively on converting those that are reluctant – and, I understand, sometimes ***rightly reluctant***" to adopt such "digital substitutes" for textbook sales. (*Id.*)

29.     Thus, upon exiting bankruptcy, the Cengage operating plan set forth a deliberate path for Cengage to reorient its business model towards a "digital solution," and away from textbook sales. Cengage's CEO knew and understood that he would need to "push very aggressively" to convert those who might be "rightly reluctant" to adopt that model. Plaintiffs are among those rightly reluctant to adopt the model, because the model undermines their agreed upon compensation structure and because they will have lasting adverse impact on the incentives for developing higher learning study materials.

### C.  The Cengage Unlimited Model

30.     The "digital substitute" anticipated by Hansen in 2014 turns out to be Cengage Unlimited. Cengage Unlimited is an "all access" electronic subscription model for access to Cengage's catalog of thousands of titles: think Netflix for Sociology, Mathematics, and Advanced Psychology textbooks. Instead of buying books on a per-course basis, students will pay a one-price subscription fee per semester, for access to Cengage's electronic catalog.

31.     Under the "Cengage Unlimited" model, Cengage will allocate some or all of its subscription fees into several different "Revenue Pools," based upon the types of material included with Cengage Unlimited access (*i.e.*, courseware supplements, e-books, or print rental).

32.     Cengage has not disclosed whether it will deduct any amounts from its subscription revenues prior to allocating the revenues to Revenue Pools, and has not disclosed the methodology by which it will allocate its subscription fees among the Revenue Pools.

33.     Cengage plans to assign each of its accessible author works into one of the Revenue Pools. Authors will be paid royalties from the Revenue Pool, based upon a function of (i) the author's contractually-agreed royalty rate to be applied to ***sales*** of the book, and (ii) the "weighted average of the ***number of uses*** x by net price as a percentage of the total for each title and product type." That is Cengage's description of the royalty calculation, which it provided to authors purportedly to clarify the royalty calculation (*see* the chart below):



34.     Cengage has expressly declined to provide any specific examples of how the Cengage Unlimited royalty calculations will work, and as of March 27, 2018, was still "working … to create a fair and accurate royalty allocation structure for the subscription fees according to the relative value of each offering." (*See* Exhibit 2 ("Author Royalty Calculation") at 2-3.)

35.     What is clear, however, is that the royalty model employed by Cengage Unlimited depends in substantial part on ***relative use*** of a title as compared to other titles in the same revenue pool. Cengage has indicated that—when it settles on an allocation structure—it will depend upon the "[q]uantity and ***usage*** for each title and product type." (*See id.* at 3.)

36.     The Cengage Unlimited royalty model is a significant departure from the royalty model agreed to in the typical publishing contract, which provides for royalties to be paid on the ***sale*** of a title—whether the student uses the book once, one hundred times, or whether it becomes a support for a lopsided dormitory bed.

37.     With a fixed pool of subscription revenue to be allocated amongst all of the titles that a subscriber accesses in a given period, and with royalties being paid based upon the ***relative use*** of one title versus another title (rather than on the volume of sales for a specific title), the Cengage Unlimited model will have a significant impact on the manner in which revenue is generated and royalties are paid out to individual authors.

38.     Indeed, because of the changes to royalty structures created by the Cengage Unlimited model, Cengage has not settled on a methodology for how to report royalty payments to authors beginning with the Fall of 2018 when it plans to roll out its new model. (*See* Ex. 2 at 4-5 ("Simplifying Our Systems").)

39.     Cengage has conducted a series of conference calls and webinars for its authors, in an effort—to use the parlance of CEO Hansen—to "convert" authors who are "rightly reluctant" to adopt the Cengage Unlimited model. During those calls and presentations, Cengage has stated that (i) authors will not be permitted to opt-out of the Cengage Unlimited model, and (ii) Cengage will be curtailing its support for individual-title sales. (*See* Exhibit 3 ("Answering Author Questions").)

40.     Cengage has refused author efforts to renegotiate Publishing Agreements so that the royalty payment provisions conform to the Cengage Unlimited model.

41.     Plaintiffs are rightly reluctant to adopt the Cengage Unlimited model for various reasons, including (i) it fundamentally undermines the compensation structure for which they contracted, *i.e.*, a royalty payment based upon the sale of their works; (ii) it transforms the incentives in textbook development and publishing to the long-term detriment of academic learning, pitting authors against each other in an effort to maximize "clicks" on digital learning materials, and emphasizes digital learning aids over printed textbooks; (iii) without transparency as to how royalties will be calculated, there is no way to know the extent to which this model functions purely as an economic transfer to Cengage's shareholders, at the expense of Cengage's authors as a class—let alone the interests of any particular author; (iv) Cengage's systematic dismantling of support for individual-title sales, in favor of marketing the Cengage Unlimited all-access pass, will cause irreparable injury to the goodwill associated with Cengage's leading titles, which became leading texts in large part because of their efficacy as teaching materials.

42.     With respect to the dismantling of its support for individual-title sales, Cengage has informed Plaintiffs that as part of the reorientation towards marketing Cengage Unlimited, it will be reducing support for the sale of individual titles, and will be curtailing the revision schedule on various works.

43.     Cengage is dismantling its support for the sale of individual titles, while emphasizing the marketing of Cengage Unlimited, for the specific purpose of retaining a greater share of its revenue stream (and therefore reducing author royalty payments). Rather than maximizing sales, as was the objective of the agreed upon royalty-on-sale Publishing Agreements and the longstanding business model that Cengage has now repudiated, the Cengage Unlimited business model prioritizes increasing overall market share for Cengage, by cross-

marketing its catalog to colleges and universities without regard to the merit of any particular

work. The Cengage Unlimited model thus undermines the agreed upon marketing, sale, and

compensation structure found in the Publishing Agreements, *i.e.*, royalties to be paid on the sale

of particular works, in favor of increasing subscription revenue to Cengage Unlimited.

**D.  Courseware Allegations**

44.    Plaintiffs' Publishing Agreements typically authorize Cengage to prepare

electronic versions of the work and "supplements" using Plaintiffs' work subject to the

Publishing Agreements. Just as with print versions of the work, the Publishing Agreements

provide for the payment of a royalty to Plaintiffs based on the ***sale*** of electronic versions and

supplements.

45.    Cengage, as part of its operational overhaul, has begun emphasizing the

development of digital "MindTap" courseware supplements. Typically, these courseware

supplements begin with and are based upon an author's work, and package the author's work in a

digital format, with homework, quizzes, tests, and multimedia materials that are intended to

enhance the learning experience. Each of the MindTap courseware applications is a derivative

work from an author work.

46.    As a matter of common practice, Cengage has arbitrarily reduced royalty

payments to Plaintiffs on courseware sales, by improperly allocating excess value in the

courseware to the digital framework, packaging, and supplements, as compared to Plaintiffs'

work that is the foundation of the specific MindTap product associated with a title. By arbitrarily

apportioning a large share of the value associated with MindTap or other courseware to the

framework and packaging supplied by Cengage—as compared to Plaintiffs' work that is the

foundation for the MindTap supplement—Cengage systematically underpays Plaintiffs the

royalties due on MindTap and other courseware sales. That is because, when calculating

royalties, Cengage only applies the royalty percentage from the Publishing Agreements to that portion of the sales revenues that it unilaterally and improperly deems to be associated with the work that is produced subject to the Publishing Agreement. Cengage does not pay any royalty on the balance of the MindTap sales revenue, which it unilaterally deems to be associated with its own contribution to the digital packaging and supplement.

47.     Cengage's practice of overvaluing the Cengage-created component of a MindTap or other courseware offering, while devaluing Plaintiffs' contributions, constitutes a breach of the Publishing Agreements, which provide for the royalty to be paid based on the sale of Plaintiffs' works, in all formats. To the extent that quizzes, tests, multimedia, or other such "add ons" to Plaintiffs' work are included in the MindTap or other courseware offering, such assemblages and add-ons are simply derivative to Plaintiffs' works, supplied pursuant to the Purchasing Agreements.

48.     Digital "courseware" constitutes one of the Revenue Pools for the Cengage Unlimited business model. Cengage has not disclosed how it will allocate its Cengage Unlimited subscription revenue among its revenue pools, but upon information and belief, Cengage intends to over-allocate revenues to the courseware Revenue Pool, so that it can minimize its royalty burden, by resorting to its practices regarding courseware royalty payments. More specifically, as alleged, Cengage systematically undervalues Plaintiffs' works in comparison to the digital packaging supplied by Cengage to create the MindTap courseware offering. By over-allocating subscription fees to the courseware Revenue Pool, and then under-allocating the value associated with courseware to Plaintiffs in comparison to Cengage (*e.g.* the value associated with a loose-leaf printed version of the text) Cengage improperly reduces its compensation to Plaintiffs.

**E. Refusal to Provide Data**

49.     Pursuant to the terms of the Publishing Agreements, and Cengage's standard operational practices, Cengage typically provides Plaintiffs with a semi annual statement of royalties paid on published works.

50.     The royalty statements are incomplete, confusing, and do not provide sufficient information from which Plaintiffs can determine whether their royalties are being fairly and accurately calculated and paid. More specifically, royalty statements contain multiple ISBNs for the same underlying work, unexplained acronyms, unexplained adjustments—and in some instances can be upward of 100 pages. Further, adjustments to royalty bearing revenue and royalty percentages are not explained.

51.     In the past several pay periods, Plaintiffs have experienced an inexplicable and disproportionate decline in royalty payments from Cengage, which does not correspond to changes in actual sales or sales revenue. Authors have seen their textbooks—which once generated a 15% royalty on net sales, replaced with courseware-laden editions, which generate far smaller royalty payments that are calculated based on arbitrarily and improperly valuing the courseware components of the titles, rather than the author's work. In some instances Class Members have seen unit sales increase, while their royalty payments are decreasing. Seeking to understand why their royalty payments have been continually declining, Plaintiffs have sought access to the sales and royalty data, in industry standard form, for purposes of determining the validity of Cengage's royalty calculations.

52.     Cengage—though it has a practice of providing confusing and incomplete royalty reports to Plaintiffs, and though it has the requested information readily available to be produced—has adopted a policy or a widespread practice of refusing to provide authors with the requested data necessary to determine the methodology and validity of the royalty calculations.

53.     The recordkeeping and royalty reporting function agreed to pursuant to the Publishing Agreements is uniquely within the control of Cengage.

54.     The recordkeeping and reporting function implies with it an obligation to provide reasonable and clear disclosure to answer Plaintiffs' good faith questions concerning the validity and accuracy of royalty reporting and accounting. Moreover, having provided partial disclosures that are misleading and lead to additional good faith questions from Plaintiffs, Cengage has reasonably assumed an obligation to provide sufficient information so that the validity of the royalty statements can be determined.

55.     Cengage's partial disclosure of royalty data, under circumstances that raise questions concerning the accuracy of their royalty reporting, and its corresponding refusal to supply supporting documentation that is reasonably necessary to determine the validity of the royalty reporting, and which is available to Cengage based on its existing recordkeeping practices, constitutes a breach of the implied covenant of good faith and fair dealing.

**F.  Class Allegations**

56.     Plaintiffs have brought this action as a nationwide class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), on behalf of themselves and all other authors, and/or respective successors in interest), who (i) have entered into Publishing Agreements, as defined, with Cengage (or any of its predecessors or successors in interest), and therefore contracted for the payment of royalties based on the ***sale*** of their work (the "Class," and each member a "Class Member"). Excluded from the Class are Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with Defendants, including, without limitation, persons who are officers, director, employees, associate or partners of Cengage.

57.     This action satisfies the requirements of FRCP Rule 23 and is properly maintained as a class action.

58.     Courts have previously upheld complaints brought by authors against publishers on a class basis, based upon common terms in various publishing agreements and common practices by the publisher, to the extent that the plaintiffs seek to determine common issues of law and fact affecting the class.

59.     The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Upon information and belief, thousands of persons have entered into Publishing Agreements with Cengage or its predecessors in interest, and have bargained for the publisher to provide support for the publication, *sale*, and distribution of their works.

60.     There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member. The common questions of law and fact include, without limitation:

a.     Whether the Cengage Unlimited model frustrates Class Members' ability to earn royalties on the sale of his or her work pursuant to a Publishing Agreement;

b.     Whether, by dismantling its support for the sale of individual titles, and reorienting its efforts towards the Cengage Unlimited model, Cengage has breached the covenant of good faith and fair dealing implicit to each of the Publishing Agreements;

c.     Whether Cengage should be obligated, as a matter of law and equity, to disclose clearly their royalty calculation methodology, and the royalty calculations that it will employ in the Cengage Unlimited model;

d.     Whether the methodology used by Cengage to define and fund Revenue Pools is consistent with the Publishing Agreements;

e.     Whether, to the extent that Cengage deducts revenue from its subscription fee base, prior to allocating revenue to the Revenue Pools, those deductions are permitted by the Publishing Agreements;

f.     Whether Cengage's allocation of subscription fees to various Revenue Pools is consistent with the Publishing Agreements.

g.     Whether Cengage's methodology for allocating Revenue Pool funds among different works, based upon various factors including the *relative use* of those titles, comports with the Publishing Agreements;

h.     Whether Cengage should be obligated, as a matter of law or equity, to permit Class Members to 'opt-out' of the Cengage Unlimited model;

i.     Whether Cengage's methodology for determining the relative value apportionable to Class Members' works, for purposes of calculating royalties on MindTap and other courseware offerings, comports with the Publishing Agreements;

j.     Whether Cengage has an obligation to provide reasonable disclosure of sales and royalty-related information in connection with its provision of partial and confusing royalty statements;

k.     Whether Class Members have sustained damages or irreparable injury as a result of Cengage's implementation of the Cengage Unlimited model, and if so, the proper measure to be applied in determining damages and restitution;

l.     Whether Class Members may terminate their Publishing Agreements with Cengage in connection with Cengage's implementation of the Cengage Unlimited model or otherwise for fundamental breach of the Agreement.

61.     Plaintiffs' claims are typical of the claims of the Class and Plaintiffs have no interests adverse or antagonistic to the interests of other members of the Class—except to the extent that Cengage implements the Cengage Unlimited model and pits Class Members against each other competing, based on relative use, for a share of a Revenue Pool.

62.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained experienced counsel, competent in the prosecution of class action litigation.

63.     A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein. Plaintiffs do not anticipate that unusual difficulties are likely to be encountered in the management of this class action.

64. A class action will permit a large number of similarly situated persons to prosecute their common claims in a single forum, simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender, or the inconsistency in results that might occur if the claims were litigated independently.

65. In particular, because the Cengage Unlimited model makes Class Members' royalties dependent upon the relative use of each Class Members' work—a business decision unilaterally adopted by Cengage that is not consistent with the Publishing Agreements—uniformity in treatment of the claims is crucial to a fair, equitable, and just result.

66. By implementing Cengage Unlimited, Cengage is acting on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT

67. By implementing the Cengage Unlimited model, Cengage has breached its Publishing Agreements with Class Members in at least four ways: (i) by frustrating Class Members' ability to earn royalties for the sale of their works, which was the fundamental bargain struck pursuant to the Publishing Agreements; (ii) by breaching the covenant of good faith and fair dealing implicit to the Publishing Agreements, in implementing the Cengage Unlimited model that undermines the royalty-on-sale bargain struck by the Publishing Agreement; and (iii) by improperly and unfairly determining the royalty to be paid to Class Members under the Cengage Unlimited model as a function of *relative use* rather than *sale* of works.

68. Cengage has breached its Publishing Agreements with Class Members by systematically undervaluing Class Member contributions to courseware, MindTap, and other

similar digital offerings, thereby underpaying royalties to Class Members on those courseware offerings.

69.     Cengage has breached the implied covenant of good faith and fair dealing implicit to the Publishing Agreements by refusing to provide reasonable disclosure of sales and royalty data as necessary to answer questions concerning the validity of its royalty calculations, and its confusing royalty statements.

### SECOND CAUSE OF ACTION:
### TORTIOUS INTERFERENCE WITH CONTRACT

70.     Cengage Holdings knows that Class Members have existing Publishing Agreements with Cengage.

71.     Cengage Holdings has intentionally caused and/or procured a breach of the Publishing Agreements by Cengage Learning (or other Cengage affiliates) without a reasonable justification for that breach.

72.     More specifically, Cengage Holdings has caused and/or procured Cengage Learning or other Cengage affiliates to breach its Publishing Agreements, for the unreasonable and unjust purpose of shifting onto Class Members Cengage's own losses and liabilities, which would otherwise be incurred by shareholders of Cengage Learning II Holdings Inc. By intentionally undermining the contractual *royalty per sale* model—knowing that Class Members would "rightfully resist" such unilateral changes—and willfully being "very aggressive" in effectuating the breach of the Purchasing Agreements, Cengage Holdings has intentionally and improperly caused Cengage and Cengage affiliates to breach the Publishing Agreements in a manner that benefits Cengage, and at the expense of the Class Members.

73.     Cengage Learning (and other Cengage affiliates) have actually breached the Publishing Agreements with Class Members, or will imminently breach the Publishing

Agreements with Class Members, by implementing the Cengage Unlimited model at the direction of Cengage Holdings.

74.     Class Members have been damaged in an amount to be determined at trial as a result of the breach of their Publishing Agreements with Cengage.

**THIRD CAUSE OF ACTION:**
**DECLARATORY AND INJUNCTIVE RELIEF**

75.     Class Members seek declaratory and injunctive relief (i) determining that the Cengage Unlimited model has caused irreparable injury to Class Members, and will continue to cause additional irreparable injury, as a result of, *inter alia*, damage to the goodwill associated with Class Members' works and the lost opportunity to sell their works, based upon Cengage's curtailment of support for the marketing and sale of works; (ii) enjoining Cengage from including Class Members' works in the Cengage Unlimited plan without Class Members opting-in to the new distribution and compensation model being advanced by Cengage; and (iii) declaring that, to the extent that Cengage has materially breached the Purchasing Agreements by including Class Members' works in Cengage Unlimited without their permission, Class Members are entitled to terminate the Publishing Agreements and to obtain a reversion of all rights granted to Cengage pursuant to the Purchasing Agreements.

WHEREFORE, Plaintiffs prays for judgment accordingly:

A.     Declaring that this action is properly maintainable as a class action, and certifying Plaintiffs as Class representatives;

B.     Declaring that the Cengage Unlimited model has and will cause irreparable injury to Class Members, and restraining Defendants, their employees, agents, and successors, from *inter alia*, including or maintaining Class Members' works in Cengage Unlimited without their express "opt-in" permission;

C.     Declaring that, to the extent that Cengage has materially breached the Purchasing Agreements by including Class Members' works in Cengage Unlimited without their permission, Class Members are entitled to

terminate the Publishing Agreements and to a reversion of all rights granted to Cengage pursuant to the Publishing Agreements;

D.      Awarding damages in an amount to be proved at trial, but exceeding $5 million to Class Members and $75,000 to Plaintiffs, for (i) Cengage Limited's breach of the Publishing Agreements and (ii) Cengage Holdings' tortious interference with the Publishing Agreements;

E.      Awarding pre- and post-judgment interest;

F.      Awarding Plaintiffs and the Class the costs of this action, including reasonable attorneys' fees and expenses; and

G.      Awarding Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

New York, NY
Dated: May 14, 2018

SLARSKEY LLC

By: _____
David Slarskey
Evan Fried (admitted in New York State,
pending in Southern District of New York)
800 Third Avenue, 18th Floor
New York, NY 10022
(212) 658-0661
*Counsel for Plaintiffs*

Josh Seifert
SEIFERT PLLC
175 Varick Street
New York, NY 10014
(646) 470-2647